**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 28 2013, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**BRYAN LEE CIYOU**
**LORI B. SCHMELTZER**
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**JANE G. COTTON**
Anderson, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE PATERNITY OF: B.V.L., | ) | |
| | ) | |
| S.B., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 48A02-1206-JP-491 |
| | ) | |
| B.L., | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MADISON SUPERIOR COURT
The Honorable George Pancol, Judge
Cause No. 48D02-1010-JP-401

**February 28, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Respondent, S.B. (Mother), appeals the trial court's judgment granting custody of two-year-old B.V.L. to Appellee-Petitioner, B.L. (Father).

We affirm.

## ISSUE

Mother raises two issues on appeal, which we consolidate and restate as follows: Whether the trial court abused its discretion when it awarded Father custody of B.V.L.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the trial court's judgment reveal that B.V.L. was born on March 3, 2010. Two days later, Mother and Father signed a paternity affidavit. Following B.V.L.'s birth, Mother began to act erratically. She stayed up all night, slept all day, and she did not bathe. Medication for anxiety and depression did not help her. In September 2010, she left the home she shared with Father and took B.V.L. with her. She told police officers that Father had threated to kill her and B.V.L. and got a protective order. Father denied making the threats.

After leaving, Mother periodically returned to the home unexpectedly. For example, one day Father got out of the shower to find Mother standing in the bathroom staring at him. Father eventually changed the locks on the doors, but Mother broke a window to get into the house, cut her arm on the broken glass, and left a trail of blood throughout the home. Mother explained that she had returned to the house to force Father

2

to visit with B.V.L. even though there was a protective order in place. Shortly thereafter, Father obtained a protective order against Mother.

On October 18, 2010, Mother filed a Petition to Establish Paternity of a Child and Provide for his Custody, Support, and Maintenance. Father filed a response on November 1, 2010. Three weeks later, on November 23, 2010, Father filed a Petition for Emergency Custody, wherein he alleged that he had reasonable cause to believe Mother suffered from extreme mood changes, had short-term memory loss, and exhibited irrational thoughts and speech patterns. On November 29, 2010, the trial court ordered that "pending further hearing custody will be placed with [Mother] reserving to the [Father] all reasonable rights of visitation." (Appellant's App. P. 32). On January 13, 2011, the trial court ordered Father to pay child support. In February 2012, Father filed a Petition for Custody asking for full custody of B.V.L. The trial court held hearings on March 19, 2012, and May 7, 2012.

Testimony at the hearings revealed that Mother had moved several times since the parties separated. She moved from Father's house to her mother's house and then to her sister and brother-in-law's house. While she was at her sister's house, her brother-in-law moved out, and her sister's boyfriend, David Blessing (Blessing), moved in. Blessing has a significant criminal history including driving while intoxicated, driving while suspended, and public intoxication. He also has a reputation as a partier and a drug user. The evidence further reveals that Mother's sister and Blessing once got into a fight because Blessing ate all of B.V.L.'s food. Blessing is usually present when Father picks

up B.V.L. and makes it a point to kiss B.V.L. on the lips before the child leaves because Blessing knows this makes Father feel uncomfortable. Mother has not had stable housing or employment since she left Father's house.

On the rare occasions that Mother is present when Father picks up B.V.L., Mother is very insulting to Father in front of B.V.L. For example, Mother tells B.V.L. that his "stinky old dad" or his "dumbass dad" has arrived to pick him up. (Transcript, pp. 102, 106). Mother also tells B.V.L. to call Father an "asshole." (Tr. p. 105). When it is time for B.V.L. to return to Mother's house, the child will cry, scream, grab on to his car seat, and beg not to go.

Although Father has attempted to remain cordial with Mother, the exhibits in this case are replete with disparaging text messages that Mother has sent to Father. For example, in one message, Mother told Father to "F*** off, pscho," and in another message, she told him that he was a "crappy person." (Petitioner's Exh. 7). When Father reminded Mother that she needed to keep the trial court informed of her current address, Mother responded, "U r really immature. Grow up u really think they would give a child custody of a child? Ha!" (Petitioner's Exh. 7). When Father confronted Mother about failing to buckle B.V.L. in his car seat and threatened to report her to the police, Mother responded, "Quit, cause nobody cares what you say. U r a liar. Call the cops, I love it. It only makes you look stupid." (Petitioner's Exh. 7).

Mother also threatened to call the police if Father attended B.V.L.'s doctor's appointment and then refused to tell Father what the doctor had said about B.V.L.'s

medical condition. Specifically, Mother responded as follows by text to Father's requests for information about B.V.L: "Leave me alone. I'm not going to tell you again. Loser." (Petitioner's Exh. 16). When Father asked Mother to co-parent B.V.L. with him, Mother responded, "Those days are long gone pscho. Everything you say is complete bullshit. U are fake." (Petitioner's Exh. 16). One night when Father brought B.V.L. home with a toy mower and flashlight, Mother refused to take the flashlight, kicked the toy mower off the porch, and told Father that she did not want Father's "shit" in her house. (Tr. p. 95).

The evidence presented at the hearing reflects that Father and B.V.L. have a close relationship. B.V.L. adores Father, talks about him all the time and recently insisted on Father taking care of him when he was sick. Father is a "hands on" parent who takes B.V.L. fishing and boating. (Tr. p. 73). Father also has an eleven-year-old daughter (Daughter) from a previous relationship. Mother complained in the past that Father loved Daughter more than he loved her.

One day, Father and Daughter picked up B.V.L. from Mother at a local park. Father, Daughter, and B.V.L. walked to a nearby playground. Mother and her friends stared at Father and Daughter and mocked them. Daughter said she was very uncomfortable and asked to leave the park. When Father mentioned the incident to Mother, Mother responded: "your pretty scary yourself teach ur daughter how to have a backbone and not to follow in your paranoid pscho footsteps. Ur both weirdos." (Petitioner's Exh. 7).

Following the hearing, the trial court issued an order awarding Father custody of B.V.L. Mother now appeals. Additional facts will be provided if necessary.

DISCUSSION AND DECISION

At the outset, we note our preference for granting latitude and deference to the trial court judges in family law matters. *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002). The Indiana Supreme Court explained the reason for this deference in *Kirk*:

> While we are not able to say the trial court could not have found otherwise than he did upon the evidence introduced below, this [c]ourt as a court of review has heretofore held by a long line of decisions that we are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence, or that he should have found its preponderance or the inferences therefrom to be different from what he did.

*Id.* (quoting *Brickley v. Brickley*, 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). Therefore, on appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by the appellant before there is a basis for reversal. *Id.* We now turn to the issue in this case.

As a preliminary matter, Mother is correct that she initially had custody of B.V.L. by operation of law pursuant to Indiana Code section 31-14-13-1. Specifically, the statute provides that a "biological mother of a child born out of wedlock has sole legal custody of a child." However, because Father established paternity of B.V.L. within a reasonable period thereafter, the trial court was faced with an initial determination of custody between Mother and Father pursuant to Indiana Code section 31-14-13-2. *See In*

6

*re Paternity of Winkler*, 725 N.E.2d 124 (Ind. Ct. App. 2000). Further, because Father's custody petition requested "full custody," of B.V.L., Father was clearly requesting both legal and physical custody of his minor son. Mother is therefore appealing an order that gave Father sole legal and physical custody of his son.

The gravamen of Mother's argument is that the trial court erred in concluding it is in B.V.L.'s best interests to be placed in Father's custody. Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion. *Aylward v. Aylward*, 592 N.E.2d 1247, 1250 (Ind. Ct. App. 1992). On review, we will not reweigh the evidence, judge the credibility of witnesses, or substitute our judgment for that of the trial court. *Id.* We will not reverse unless we find the trial court's logic is against the logic and effect of the facts and circumstances before the court or the reasonable inferences drawn therefrom. *Id.*

This case arises out of a paternity action. Indiana Code section 31-14-13-2 provides in relevant part that:

The court shall determine custody in accordance with the best interests of the child. In determining the child's best interests, there is not a presumption favoring either parent. The court shall consider all relevant factors, including the following:

> (1) The age and sex of the child.
> (2) The wishes of the child's parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>> (A) the child's parents;
>> (B) the child's siblings; and
>> (C) any other person who may significantly affect the child's best interest.
> (5) The child's adjustment to home, school, and community.

7

(6) The mental and physical health of all individuals involved.
(7) Evidence of a pattern of domestic or family violence by either parent.

Our review of the evidence reveals that Mother is constantly calling Father disparaging names and encouraging B.V.L. to do the same. Mother will not allow B.V.L. to bring home items that Father has given him. At least one time Mother refused to allow Father to attend B.V.L.'s medical appointment and then refused to give him information about his son's medical condition. Mother has failed to buckle B.V.L. in his car seat, and has allowed B.V.L. to live at Mother's sister's house with a convicted felon. Father, on the other hand, is very respectful of Mother in B.V.L.'s presence. Father and B.V.L. are very close. B.V.L. talks about Father all the time and recently insisted on Father taking care of him when he was sick. Father is a "hand's on" parent who takes B.V.L. fishing and boating. Further, when it is time to go to Mother's house, B.V.L. will cry, scream, grab on to his car seat, and beg not to go.

In addition, Mother appears to have had mental health issues since B.V.L.'s birth. Medication has not helped her. She left home with B.V.L. when he was six months old and told police officers Father had threatened to kill them both. She has not had stable housing or employment since that time.

## CONCLUSION

Based on the foregoing, we conclude that the trial court did not err in awarding Father legal and physical custody of B.V.L.

Affirmed.

8

BAKER, J. and BARNES, J. concur